# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**TAMIKA GLENN o/b/o V.A.G., a minor**
           **Plaintiff,**

      **v.**                               **Case No. 16-C-573**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
           **Defendant.**

---

## DECISION AND ORDER

Plaintiff Tamika Glenn, on behalf of her minor daughter V.A.G., seeks judicial review of the denial of V.A.G.'s application for supplemental security income ("SSI") benefits. Plaintiff alleged her child's disability based on hearing loss and an adjustment disorder, but an Administrative Law Judge ("ALJ") found that these impairments caused less than marked limitations in V.A.G.'s functioning. The Appeals Council denied review, making the ALJ's decision the final word from the Commissioner of Social Security for purposes of judicial review. See Loveless v. Colvin, 810 F.3d 502, 506 (7th Cir. 2016). On review of the record and the briefs, I affirm the ALJ's decision.

## I. STANDARD OF REVIEW

The court will reverse an ALJ's decision only when it is not supported by substantial evidence, meaning such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Pepper v. Colvin, 712 F.3d 351, 361-62 (7th Cir. 2013). Under this deferential standard, the court will not re-weigh the evidence or substitute its judgment for the ALJ's. Id. at 362. In rendering a decision, the ALJ must build a logical bridge from the

evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence.  Id.

Because social security proceedings are non-adversarial, the ALJ has a duty to fully develop the record.  See Andrews v. Bowen, 848 F.2d 98, 101 (7th Cir. 1988).  However, the court gives deference to an ALJ's decision about how much evidence is sufficient to develop the record fully and what measures, including arranging additional consultative examinations or summoning a medical expert to testify at the hearing, are needed in order to accomplish that goal.  See Poyck v. Astrue, 414 Fed. Appx. 859, 861 (7th Cir. 2011) (citing Nelms v. Astrue, 553 F.3d 1093, 1098 (7th Cir. 2009); Kendrick v. Shalala, 998 F.2d 455, 458 (7th Cir. 1993)); Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004).  The ALJ may be required to obtain an additional medical opinion if the evidence is ambiguous, if specialized medical evidence is required but missing from the record, or if there is a change in a condition but the current severity of the impairment is not established.  See Poyck, 414 Fed. Appx. at 861 (citing 20 C.F.R. § 416.919a(b)).  Particularly in cases where the claimant is represented by counsel, however, the burden is on the claimant to introduce some objective evidence that such further development of the record is required.  Id. (citing Skinner v. Astrue, 478 F.3d 836, 844 (7th Cir. 2007); Hawkins v. Chater, 113 F.3d 1162, 1167 (10th Cir. 1997)).

## II.  DISABILITY STANDARD FOR CHILDREN

A child qualifies as disabled – and thus eligible for SSI – if she has a medically determinable physical or mental impairment, which results in marked and severe functional limitations and which has lasted or can be expected to last for a continuous period of not less than 12 months.  Hopgood ex rel. v. Astrue, 578 F.3d 696, 699 (7th Cir. 2009) (citing 42 U.S.C. § 1382c(a)(3)(C)(i)).  In determining whether a child qualifies as disabled, the ALJ applies a

2

three-step test, asking: (1) whether the child is engaged in substantial gainful activity; (2) if not, whether the child has a severe medical impairment or combination of impairments; and (3) if so, whether the child's impairments meet, medically equal, or functionally equal the severity of any of the presumptively disabling impairments set forth in the agency's Listings. Id.

In order to meet a Listing, the claimant must demonstrate that she satisfies all of the various criteria specified in the Listing. Ribaudo v. Barnhart, 458 F.3d 580, 583 (7th Cir. 2006) (citing Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999)). "Medical equivalency exists if the child's impairment 'is at least equal in severity and duration to the medical criteria of the listed impairment.'" Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005) (quoting Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 689 (8th Cir. 2005)). To determine whether an impairment is functionally equivalent to a Listing, the ALJ evaluates the child-claimant's degree of limitation (i.e., extreme, marked, less than marked, or no limitation) in six "domains": (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being. See 20 C.F.R. § 416.926a(b)(1). To functionally equal the listings, the child must have an "extreme" limitation in one domain or a "marked" limitation in two domains. 20 C.F.R. § 416.926a(a). A "marked" limitation exists when the impairment seriously interferes with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation exists when a child's impairment interferes very seriously with her ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(I).

3

### III. FACTS AND BACKGROUND

**A.      Application, Supporting Materials and Administrative Determinations**

Plaintiff filed the instant application on behalf of V.A.G. in May 2012, alleging disability as of August 1, 2005,[1] to due to auditory neuropathy.[2]  (Tr. at 177, 198, 207.)  In a function report, plaintiff reported that V.A.G. had problems with hearing and balance (Tr. at 189), but she noted no issues with communication, learning, or physical abilities (Tr. at 191-93).[3]

In a questionnaire dated August 30, 2012, V.A.G.'s fourth grade teacher listed V.A.G.'s current instructional level in reading at 5.2, written language 5, and math 5.  (Tr. at 216, 233.)  The teacher indicated that she observed no limitations in V.A.G.'s ability to acquire and use information, attend and complete tasks, interact and relate with others, move about and manipulate objects, and care for herself.  (Tr. at 217-21.)  Under the category of health and physical well-being, the teacher noted V.A.G.'s use of assistive technology – a microphone/hearing aid.  (Tr. at 222.)  The teacher concluded: "[V.A.G.] is academically a very

---

[1]Plaintiff previously filed an application on behalf of V.A.G. in 2007 alleging the same onset date, which was denied in 2010.  (Tr. at 109-10.)  At the January 14, 2010, hearing on that application, when V.A.G. was seven years old, the ALJ summoned a medical expert ("ME"), who testified V.A.G. did not meet a Listing, considering the provisions for asthma (§ 103.03) and hearing loss (§ 102.08).  On the latter impairment, the ME testified that V.A.G. did not meet the Listing because the hearing loss was not bilateral; while she had profound hearing loss in one ear, the other functioned well.  The ME further noted that her hearing loss did not cause a serious language impairment.  (Tr. at 71.)

[2]Auditory neuropathy is a hearing disorder in which sound enters the inner ear normally but the transmission of signals from the inner ear to the brain is impaired. https://www.nidcd.nih.gov/health/auditory-neuropathy.

[3]Plaintiff checked "yes" regarding whether the impairment affected V.A.G.'s behavior with other people, but then indicated that V.A.G. had friends her own age, could make new friends, generally got along with adults, generally got along with teachers, and played team sports.  (Tr. at 194.)

4

high functioning student in all subjects. She is [a] cooperative, friendly, and very well mannered child. [V.A.G.] uses a specially devised hearing aid while in the classroom setting." (Tr. at 223.)

The agency also obtained a copy of a Milwaukee Public Schools ("MPS") Section 504 Evaluation Report dated October 17, 2012. The report indicated that V.A.G. was currently in the 5th grade, with hearing concerns first noted at the age of three. V.A.G. was diagnosed with profound hearing loss in the right ear secondary to Auditory Neuropathy Spectrum Disorder ("ANSD"), which creates a problem with the connection of sound to the auditory nerve, when she was five. V.A.G. reported that speech and other noises sounded very distorted in the right ear. Her hearing in the left ear fluctuated due to chronic middle ear issues, which had been treated with multiple sets of ear tubes by Dr. Timothy Martin. V.A.G. was fit with a personal FM system[4] by an audiologist in 2009 and reported good subjective benefit. Her hearing loss limited her access to auditory information in the classroom, especially where there was background noise or the speaker was at a distance. She also had trouble localizing to the source sound, which made it difficult for her to follow group discussions and could have safety implications. MPS concluded that, due to her hearing loss, V.A.G.'s ability to learn and communicate could be compromised without appropriate accommodations.[5] (Tr. at 225.)

---

[4]Personal frequency modulation ("FM") systems are like miniature radio stations operating on special frequencies. The personal FM system consists of a transmitter microphone used by the speaker (such as a teacher in the classroom) and a receiver used by the listener. http://www.asha.org/public/hearing/FM-Systems.

[5]V.A.G. was evaluated for an IEP in January 2009 but did not qualify for services as it was found that her hearing loss did not significantly impact her learning development. (Tr. at 226.) An IEP is an individualized education program developed for a child with a disability. http://dpi.wi.gov/sped/topics/individualized-education-program.

V.A.G. was observed in the classroom and appeared to use the FM system independently and appeared at ease using it in front of her peers.  (Tr. at 226.)  School officials found V.A.G. eligible for accommodations based on her ANSD (Tr. at 227), which would include preferential seating close to the instructor, use of an assistive listening device, limitation of background noise where possible, more frequent checks for comprehension, increased use of visual cues, and work on building self-advocacy skills (Tr. at 229).

The agency denied the application initially on December 5, 2012, relying on the assessment of consultant Mary Jo Freitag, M.D.  (Tr. at 108, 128.)  Dr. Freitag noted that V.A.G. had profound hearing loss in her right ear, but her left ear was almost normal.  Speech recognition was 100% in the left ear.  Dr. Freitag evaluated the claim under Listing 102.10 (hearing loss not treated with cochlear implantation), finding that V.A.G. did not satisfy that provision.  (Tr. at 112.)  Under the domains, Dr. Freitag found no limitation in acquiring and using information, no limitation in attending and completing tasks, no limitation in interacting and relating with others, no limitation in moving about and manipulating objects, no limitation in caring for oneself, and less than marked limitation in health and physical well-being.  Dr. Freitag concluded that while V.A.G. had profound hearing loss in her right ear, her left ear had very mild hearing loss.  With an FM device at school V.A.G. performed above grade level, she had no problem making and keeping friends, and she was able to pay attention in class.  An audiologist indicated that V.A.G. complained of balance problems, but neither her mother nor her teacher reported any problems with physical activities.  Dr. Freitag thus determined that V.A.G. did not functionally equal a Listing.  (Tr. at 113.)

Plaintiff requested reconsideration (Tr. at 132), and on March 26, 2013, submitted a child's daily activities questionnaire (Tr. at 240).  In that report, plaintiff indicated that V.A.G.'s

6

condition caused her to have more doctor visits than a typical child her age, including issues with ear infections, which affected her school attendance. Her condition also affected her behavior as she cried a lot because she could not hear like everyone else. Plaintiff indicated that she understood V.A.G.'s speech very well but sometimes other people did not understand her. (Tr. at 241.) V.A.G. needed people to repeat things; she tried to read lips. V.A.G. attended after-school activities at her school for reading and to play with friends. V.A.G. liked to read, wanted to learn, and enjoyed arts and crafts. (Tr. at 242.) She had good behavior for a child her age. (Tr. at 243.) V.A.G. could handle her personal care needs but had trouble identifying unsafe situations in the city due to the noise. V.A.G. was able to do arts and crafts, read, make a sandwich, clean her room, and bathe. She helped with inside chores but not outside tasks. (Tr. at 244.) V.A.G. did chores to her mother's satisfaction. (Tr. at 245.)

On May 3, 2013, the agency denied the request for reconsideration, this time relying on the assessment of Mary Harkness, M.D. (Tr. at 117, 135.) Dr. Harkness noted the history of profound hearing loss in the right ear and fluctuating hearing in the left ear with chronic middle ear issues treated with multiple sets of tubes, most recently in May 2011. V.A.G. was provided a personal FM system in 2009 and reported good subjective benefit. In 2009, she did not qualify for special education services as it was found that her hearing loss did not significantly impact her learning development. With the FM device, she was performing above grade level at school, had no problems making/keeping friends, and was able to pay attention in class. The latest testing reported stable hearing loss on the right, normal to mild loss on the left. (Tr. at 123.) Dr. Harkness also found that V.A.G. did not meet Listing 102.10 (Tr. at 123) and agreed with Dr. Freitag regarding the domains (Tr. at 123-24).

On May 29, 2013, plaintiff requested a hearing before an ALJ (Tr. at 139), submitting

7

another disability report, indicating that V.A.G. experienced severe depression and that her hearing and ear infections were worse. (Tr. at 249.) She also experienced mood swings. (Tr. at 251.)

On September 22, 2014, the agency issued a notice of hearing, scheduling V.A.G.'s hearing before the ALJ for October 29, 2014. (Tr. at 152.) On October 23, 2014, plaintiff submitted additional records from MPS, specifically, V.A.G.'s September 2013 and September 2014 Section 504 Evaluation Reports. (Tr. at 341-42.)

The 2013 report indicated that V.A.G. had been using a district-provided FM device to assist her in the classroom during lectures and large group discussions. During observation she appeared to be comfortable using this assistive device in the classroom and around her peers. Since the beginning of school year 2013-14, V.A.G. had identified an instructor's classroom in which to keep and charge her FM monitor. V.A.G. reported difficulty localizing sounds, listening, and understanding speech in noisy environments. Distant or soft spoken speech as well as hearing/understanding speech directed towards her ear with hearing loss was also a challenge. V.A.G.'s current doctor was concerned about her safety during travel; when V.A.G. traveled alone crossing intersections she struggled with the localization of traffic sounds. This had caused threats to her safety while in her neighborhood. (Tr. at 343.) The MPS accommodation plan again included preferential seating, use of an assistive listening device, limited background noise whenever possible, more frequent checks for comprehension, increased use of visual cues, and work on building self-advocacy skills. This time, the plan also included transportation services to and from school; the bus would stop at the closest available corner. (Tr. at 345).

The 2014 Section 504 Report indicated that in September 2013 the hearing in V.A.G.'s

8

left (better) ear dropped to a mild sensorineural hearing loss, and she was subsequently fit with a hearing aid for that ear. According to the MPS audiologist, V.A.G.'s ability to learn and communicate would be compromised without appropriate accommodations. While V.A.G. reported that she benefitted from use of the FM device, she expressed concern regarding how her peers would perceive her when she used it. Her mother also reported that V.A.G. felt ashamed of her diagnosis and had been seeing a therapist. Her mother further reported difficulties with balance at times. During the 2013-14 school year, V.A.G. mostly earned As and Bs, with one D. On the "MAP" test she scored in the 74th percentile in math and the 79th percentile in reading. She also had good attendance, 97%. (Tr. at 351.) This report again listed accommodations of preferential/strategic seating, use of an assistive listening device, limited background noise whenever possible, more frequent checks for comprehension, increased use of visual cues, work on building self-advocacy skills, and transportation services to and from school; the report added the accommodation of a check for hearing before assessments. (Tr. at 354).

Plaintiff also submitted prior to the hearing an October 22, 2014, letter from V.A.G.'s therapist, Robert Jarvis, LCSW. Jarvis indicated that he saw V.A.G. for psychotherapy related to a diagnosis of adjustment disorder with mixed anxiety and depression. (Tr. at 358.)

In a pre-hearing memorandum dated October 24, 2014, plaintiff's counsel indicated that V.A.G.'s date of birth was March 14, 2002, making her a school-aged child in May 2012, when the application was filed. Counsel further indicated that V.A.G. had not engaged in substantial gainful activity since May 2012, and that she suffered from the severe impairments of right total hearing loss secondary to ANSD, left ear sensorineural hearing loss, and adjustment disorder with mixed anxiety and depression. At step three, counsel argued: "She has a hearing

9

impairment that meets or medically equals the severity and/or functionally equals the severity of one of the listed impairments . . . , to wit § 2.07." Counsel did not elaborate on how V.A.G. met or equaled the criteria of § 2.07 or any other Listing.[6] (Tr. at 257.) Counsel further argued that V.A.G. had marked if not extreme limitations in two or more of the six domains. (Tr. at 257-58.)

## B. Hearing Testimony

On October 29, 2014, plaintiff and V.A.G. appeared with counsel for their hearing before the ALJ. (Tr. at 78.) Counsel indicated he was waiting to receive the treatment notes from therapist Jarvis, and the ALJ indicted he would hold the record open for one week to obtain those records. (Tr. at 80-81, 106.)

### 1. V.A.G.

The ALJ used an amplifier in questioning V.A.G. (Tr. at 82), then age 12 and in the 7th grade (Tr. at 84). V.A.G. indicated she was doing well in school, aside from difficulties with hearing. (Tr. at 84-85.) She used her FM unit at school, which allowed her to hear what the teachers were saying, so long as it was a quiet environment. (Tr. at 85-86.) At home, her mother had to repeat herself sometimes. She was able to communicate with friends if they stood close by. She indicated that her left ear hearing aid was working well. (Tr. at 86.)

V.A.G. testified that in her free time she liked to read. She also indicated she was involved in an after-school program. (Tr. at 87.) She did chores at home such as cleaning her

---

[6]Section 2.07 is an adult Listing covering disturbance of labyrinthine-vestibular function (including Meniere's disease), characterized by a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing. It requires a showing of (A) disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests; and (B) hearing loss established by audiometry. 20 C.F.R. Pt. 404, subpt. P, App. 1, § 2.07.

10

room, washing dishes, and cleaning the bathroom. (Tr. at 88.) She testified the most difficult thing for her was accepting her condition and what other people thought of her. (Tr. at 89-90.) V.A.G. testified that she would like to try gymnastics but balance problems related to her hearing loss would make that hard. Asked if she had problems walking or running, V.A.G. said she was very clumsy. (Tr. at 90.) She indicated that she could ride a bike (Tr. at 90) and could roller skate but did fall (Tr. at 91).

Counsel asked V.A.G. if she could go out of the house by herself, and V.A.G. responded no, because of traffic. (Tr. at 91.) She had someone walk with her. (Tr. at 91-92.) She indicated that she could not tell where noises, like horns or traffic sounds, were coming from on the right side but could on the left side. (Tr. at 92.) She stated that if she would not be crossing the street she could go outside, into the yard or sidewalk, but she still had someone with her sometimes. (Tr. at 92.) She indicated that she was afraid of being outside by herself and so did not take the chance. (Tr. at 93.)

V.A.G. testified that she rode a special bus, which picked her up right in front of her house so she would not have to cross the street. (Tr. at 93.) She indicated that in situations where she did not have the FM unit, such as gym class, she had a difficult time hearing the instructor. (Tr. at 94.) She had to be up close to communicate with classmates; they would have to talk louder, or she would lip read.[7] (Tr. at 95.) V.A.G. testified that she felt self-conscious about her hearing problem, which interfered with her interaction with classmates. (Tr. at 95.)

---

[7]V.A.G. later testified she followed most of what the ALJ said during the hearing by reading his lips.

### 2. Plaintiff

Plaintiff testified that V.A.G. was afraid of meeting new people because of how they would perceive her and might tease her because of her hearing aid. At home, she was clumsy; it was hard for her to walk up and down stairs without falling or skipping a step. Plaintiff did not allow V.A.G. outside by herself because V.A.G. could not tell which direction sound was coming from, creating danger from traffic. (Tr. at 99.) Plaintiff testified that she used the FM unit with V.A.G. at home a majority of the time. (Tr. at 99-100.) The unit worked well when functioning properly. (Tr. at 100.)

Plaintiff testified that V.A.G. had been seeing a social worker for about three years addressing issues with anxiety and depression. She had a hard time being singled out for a special spot in class, sitting right up front. She was doing very well in school, aside from a D in gym due to her balance problems. (Tr. at 100-01.) Plaintiff helped her in the shower due to balance issues. (Tr. at 101-02.) Plaintiff did not allow V.A.G. to help cook because she once fell with a knife. (Tr. at 103.) Plaintiff testified that if V.A.G. was outside she would have her mother, brother, or grandmother with her; asked if V.A.G. insisted on that or plaintiff did, plaintiff testified, "I do." (Tr. at 104.) Asked if V.A.G. would be able to go outside by herself if allowed, plaintiff responded, "I really couldn't say right now, because we haven't tried it." (Tr. at 105.)

## C. Post-Hearing Records

### 1. Mental Health Records

On or about November 7, 2014, plaintiff provided the records from therapist Jarvis. (Tr. at 373-96.) Those records indicate that in July 2013 V.A.G. presented with complaints of

Case 2:16-cv-00573-LA   Filed 11/29/16   Page 12 of 31   Document 15

anxiety, altered mood, and social isolation. Plaintiff reported that V.A.G.'s loss of hearing caused her to be sad and made her prone to bullying at school. V.A.G. admitted feeling sad about "being the deaf girl" and self-conscious about people talking about her condition. She was comfortable around people at school she had known for several years, but she admitted that going to a new school was worrying. She also became frustrated with her mother for being overprotective about her hearing condition; she wanted more independence, such as being allowed to go to the store without having a chaperone such as her brother. (Tr. at 373.) Mr. Jarvis assessed adjustment disorder with mixed emotional features and a GAF of 61-70,[8] indicative of mild symptoms. (Tr. at 376.)

In subsequent sessions in late July and early August, V.A.G. continued to report anxious and depressed mood. (Tr. at 377, 380.) On August 21, 2013, her mother reported less crying, better hygiene, and cleaning of her room. Functioning at school had been good. (Tr. at 382.) V.A.G. reported wanting to do more things independently, such as crossing the street, but her mother was anxious to allow it. Jarvis warned that V.A.G. had to do start doing such things, otherwise the battles between them would increase as she got older. (Tr. at 382.)

In September 2013, V.A.G.'s mood was reported to be normal. Her behavior had been consistent with her mood, and she was continuing to keep up with her hygiene and bedroom without an issue. Functioning at school had been unremarkable. (Tr. at 384.)

_____

[8]GAF ("Global Assessment of Functioning") rates the severity of a person's symptoms and her overall level of functioning. Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting herself or others. Scores of 61-70 reflect "mild" symptoms and 51-60 "moderate" symptoms. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

13

In November 2013, V.A.G. reported that her mood had been anxious and sad. (Tr. at 385.) Her mother reported that she cried after school and had difficulty showering and cleaning up her room again. She continued to function well at school with good grades. Socially, her interactions had been isolative, and teachers reported that she was nervous around peers. (Tr. at 386.)

In December 2013, V.A.G. again reported that her mood had generally been anxious and sad. Functioning at school had been better. Socially, interactions had been unremarkable; she was involved in cheerleading and after school programming. (Tr. at 387.)

On May 7, 2014, V.A.G. reported that since the last session her mood had been generally anxious, irritable, and sad. Her mother reported that she had not been taking care of her hygiene. Her functioning at school had been fair. Socially, interactions had been unremarkable. After plaintiff left the session, V.A.G. shared with the therapist her frustrations in her mother not allowing her any independence, such as crossing the street without someone holding her hand. (Tr. at 389.) V.A.G. discharged from therapy at that time, in stable/good condition. (Tr. at 391.) In a discharge note dated September 3, 2014, Jarvis noted a diagnosis of adjustment disorder with mixed anxiety and depressed mood, and a GAF of 61-70, indicative of mild symptoms. (Tr. at 390-91.)

V.A.G. returned to Jarvis on October 10, 2014, reporting that since the previous session her mood had been generally anxious and sad. Functioning at school had been good with a GPA over 3.0, but interactions with her family had been poor, especially her mother. Socially, interactions had been unremarkable. V.A.G. complained about her mother's expectations. Her mother admitted seeing a therapist for OCD behaviors, and this was affecting V.A.G. Plaintiff was not willing to loosen the reins, such as allowing V.A.G. to leave the house without a

14

chaperon.  (Tr. at 392.)

On October 24, 2014, V.A.G. reported being generally sad since the last session.  Her behavior had been defiant at times towards her mother as it related to her room; Jarvis viewed photos plaintiff had brought, and the room was not as disordered as plaintiff reported. Functioning at school had been fair, and interactions with family had been poor.  Socially, interactions had been good at school.  (Tr. at 394.)  Jarvis helped V.A.G. and her mother develop a behavioral reward system.  (Tr. at 394-95.)

### 2.    School Records

Plaintiff also provided additional school records,[9] including a December 2014 MPS evaluation report for special education needs.  (Tr. at 259-60.)  The report indicated that this was V.A.G.'s third evaluation for suspected special education needs.  In November 2005, she was evaluated in the areas of speech and language and significant developmental delay, but she did not meet the criteria in either of those areas.  In January 2009, she was evaluated again, this time in the areas of hearing impairment and speech and language; she did not meet special education criteria within those areas.[10]  In October 2012, V.A.G. was evaluated for a § 504 plan for her hearing loss to receive classroom accommodations.  In September 2013, a hearing evaluation discovered a drop in hearing in her left ear, and she was subsequently

---

[9]Based on the fax transmission header on these records, it appears plaintiff submitted them on December 29, 2014.  (Tr. at 259-80.)

[10]The record also contains the reports from that evaluation.  (Tr. at 281-316.)  Those records indicated that V.A.G. was at the time the top student in her class, and her teacher had no academic or social concerns.  (Tr. at 290.)  "She is a very pleasant, charming student who has many friends, uses age appropriate social skills and is functioning in the top of her class. . . . Her unilateral hearing loss does not appear to have a significant effect on her learning development. "  (Tr. at 291.)  The IEP team concluded at that time that V.A.G. was not a student with a disability.  (Tr. at 295, 313.)

15

fitted for a hearing aid for her left ear. Following her § 504 meeting in September 2014, an audiologist put in a special education referral in the areas of hearing impairment and speech/language. V.A.G. had been a strong FM user in the past, but this school year she had chosen not to use it in the classroom. The report further indicated that the accommodations V.A.G. had received had been positive, but there were still concerns for her auditory skills and self-advocacy skills related to her hearing loss. According to MAP testing in the fall of 2014 V.A.G. scored above the national average in math and reading; according to WKCS 8th grade testing she scored "proficient" in math and reading. (Tr. at 260.) The report also indicated, based on classroom observations, that V.A.G. was "very intelligent and doing a great job in school. She is a hard worker and gets her work done." (Tr. at 261.) Her grades had dropped in reading and social studies due to not handing in all her work, but her attendance rate was 94%. (Tr. at 261.)

During testing as part of this evaluation, V.A.G. appeared to put forth excellent effort. She wore her hearing aid and FM system for testing. Her attention and concentration appeared to be excellent. On the Wechsler Intelligence Scale for Children, she scored in the high average range. (Tr. at 262.) On academic testing, she scored in the high average to superior range. (Tr. at 263.) MPS determined that V.A.G. had an impairment making her eligible for special education. Nevertheless, the evaluators noted that overall her academic skills were well above average when compared to her typically hearing peers. (Tr. at 264.) MPS found V.A.G. eligible for special education, indicating that she would benefit from repetition and rephrasing of oral questions and instructions, preferential seating in the regular education environment, and audiological supports. The report further indicated V.A.G. "will need an expanded core curriculum with specialized instruction in hearing loss self-advocacy

16

and use of technology." (Tr. at 265.)

The IEP for 12/2014 to 12/2015 (Tr. at 268) indicated:

> [V.A.G.] has a profound hearing loss secondary to [ASND] in her right ear and a mild sensorineural hearing loss in her left ear. She communicates directly with her peers and adults using residual hearing, speech reading cues, and environmental cues. She uses spoken English and her voice is clear and understandable to the average listener. [V.A.G.] participates fully in the regular education curriculum, with some modifications to the environment.

(Tr. at 272.) She needed an assistive listening device. (Tr. at 272.) The IEP listed as goals that V.A.G. would use her FM unit in school in 90% of all opportunities, would articulate her hearing loss to staff and peers in language that is understandable in 3/5 opportunities, would request flexible seating in the classroom in 3/5 opportunities, and would learn about and explain the parts of her audiogram using appropriate technical vocabulary in 3/5 opportunities. (Tr. at 273.) Her accommodations would include preferential seating, use of ALD, and repetition of directions. (Tr. at 275.) She would also receive specialized instruction in self-advocacy. (Tr. at 276.)

## D.     ALJ's Decision

On January 16, 2015, the ALJ issued an unfavorable decision. (Tr. at 12.) At step one, the ALJ concluded that V.A.G., 10 years old at the time of the application, had not engaged in substantial gainful activity since May 2012, the application date. At step two, the ALJ determined that V.A.G. suffered from the severe impairments of hearing loss and an adjustment disorder. At step three, the ALJ first determined that V.A.G. did not have an impairment that met or medically equaled a Listing, noting: "No treating or examining physician has recorded findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed

17

impairment." (Tr. at 18.)

The ALJ then turned to the domains. (Tr. at 18.) In determining V.A.G.'s degree of limitation, the ALJ considered V.A.G.'s alleged symptoms and the medical opinion evidence. (Tr. at 19.)

Through her mother, V.A.G. alleged in a disability report accompanying the application that she had been disabled since August 1, 2005 as a result of auditory neuropathy. V.A.G. testified that she could not hear in her right ear and used a hearing aid in her left ear to facilitate hearing. She also reported problems with her balance related to her hearing loss, describing herself as "clumsy." She further testified that her hearing problems made her self-conscious and created issues interacting with classmates. (Tr. at 19.)

Plaintiff testified that she used an amplification unit most of the time when communicating with V.A.G. Plaintiff did not allow V.A.G. to go outside unattended, as she feared V.A.G. could not determine the direction of sound and thus could be vulnerable to traffic or sirens. Plaintiff also confirmed V.A.G.'s clumsiness in physical activities. Finally, she reported that V.A.G. saw a therapist to adjust to the emotional problems attendant to being self-conscious about her hearing limitations. (Tr. at 19.)

The ALJ found the testimony regarding V.A.G.'s symptoms "not entirely credible." (Tr. at 19.) The ALJ noted that V.A.G. was diagnosed with a profound hearing loss in her right ear at age five, and her hearing in the left ear had fluctuated with chronic middle ear issues that had been treated with multiple sets of tubes and a hearing aid. (Tr. at 19-20.) Recent testing revealed that the left ear hearing loss remained mild. V.A.G. used a frequency modulation device at school, was able to pay attention in class, and performed above grade level. Her teacher reported in August 2012 that V.A.G. was a high functioning student in all subjects,

18

cooperative, friendly, and well-mannered. Despite the testimony of balance problems, plaintiff reported that those problems were occasional and V.A.G.'s teacher reported no observable problem with V.A.G.'s ability to move about and manipulate objects. (Tr. at 20.) The ALJ acknowledged V.A.G.'s therapy for an adjustment disorder, but this had not affected her school performance, and the record reflected that although she was self-conscious about her hearing loss she had no problem making or keeping friends. (Tr. at 20.)

As for the opinion evidence, the ALJ gave partial weight to the opinions of the state agency consultants, Drs. Freitag and Harkness, both of whom opined that V.A.G. had less than marked limitation in the health and physical well-being domain. The ALJ found this determination consistent with the evidence, which showed that other than her hearing loss V.A.G. was a healthy girl with a limited need for ongoing treatment. The consultants further opined that V.A.G. had no limitations in the other domains. The ALJ agreed in the domains of caring for oneself, interacting/relating with others, and attending/completing tasks, but found some (albeit less than marked) limitations in acquiring/using information and moving about/manipulating objects. The ALJ considered each of the domains in turn. (Tr. at 20.)

The ALJ first found less than marked limitation in acquiring and using information. Despite her hearing problem, V.A.G. consistently performed very well at school. Her hearing impairment had been accommodated with both an FM device and subsequently with a hearing aid for her left ear. V.A.G. could communicate with others and make her needs known. She had been able to pay attention in class at school, and her teacher reported age-appropriate functioning in this domain in 2012. During the 2012-13 school year, V.A.G. mostly earned As and Bs on her report card; she also scored high on the MAP test. Although she required assistive devices for hearing, the evidence confirmed less than marked limitation in this

domain. (Tr. at 21.)

The ALJ next found no limitations in attending and completing tasks. As demonstrated by teacher evaluation and grades, V.A.G. demonstrated that she is able to successfully perform in school. She had 97% attendance during school year 2013-14 and completed homework as assigned. At home, she performed regular chores such as washing dishes, cleaning the bathroom, and cleaning her room. Although plaintiff reported that she could be remiss in her work habits, V.A.G.'s therapist noted that plaintiff had her own obsessive-compulsive issues, tending to exaggerate her complaints of V.A.G.'s performance in completing tasks. (Tr. at 22.)

The ALJ also found no limitation in interacting and relating with others. (Tr. at 23.) V.A.G. reported that she often felt ashamed because of her hearing impairment; however, this did not cause her to isolate herself from others. (Tr. at 23-24.) She regularly attended school, had friends, and got along well with others. She also participated in cheerleading and other after-school activities. She was able to read lips and generally interacted with others as she chose. (Tr. at 24.)

In the domain of moving about and manipulating objects, the ALJ found less than marked limitations. V.A.G. and plaintiff reported balance issues related to the hearing impairment, and plaintiff testified to reluctance in allowing V.A.G. to leave the house alone due to her difficulty in locating the source of sounds that could indicate potential danger. However, the record indicated that this had been a source of contention, with plaintiff seen as overly protective in this regard by V.A.G.'s therapist. V.A.G.'s teacher reported no observable problem in this domain. V.A.G. was able to walk without assistive devices, ride a bike, and roller skate. (Tr. at 25.)

The ALJ found no limitation in the domain of caring for oneself. V.A.G. was able to feed

and dress herself, clean her room, and help with other household chores. School records also reflected no limitations in this domain. (Tr. at 26.)

Finally, the ALJ found less than marked limitations in health and physical well-being. V.A.G. had a right ear microscopic procedure in 2011 to remove auditory canal debris and left ear tube placement in 2012. Her left ear hearing had fluctuated with infections, but her hearing loss in that ear remained mild. Her left ear hearing was supplemented with a hearing aid in 2013, which benefitted her. Apart from her hearing impairment, V.A.G. had generally been healthy. She had adjustment difficulties relating to actual and perceived slights due to her hearing problems, but his had not diminished her ability to maintain appropriate school and social functioning consistent with her age. (Tr. at 26.)

Based on this analysis, the ALJ concluded that V.A.G. did not have an impairment or combination of impairments resulting in either marked limitations in two domains or an extreme limitation in one domain. He accordingly found her not disabled. (Tr. at 27.)

Plaintiff requested review by the Appeals Council (Tr. at 9), but on March 9, 2016, the Council denied review. (Tr. at 1.) This action followed.

## IV. DISCUSSION

Plaintiff argues (1) that the ALJ should have summoned a medical expert to the hearing to testify on the question of medical equivalence, and (2) that substantial evidence does not support the ALJ's determinations on the domains. Neither argument has merit.

## A. Medical Expert

Plaintiff notes that the state agency consultants produced their reports in December 2012 and May 2013, and that they did not have the benefit of the 2014 IEP evaluation, the

2013-14 Section 504 evaluations, and the 2013-14 mental health treatment records.    She

contends that the ALJ should have called a medical expert to update the agency reports and,

specifically, to opine on the question of medical equivalence.

Plaintiff fails to explain how any of the additional evidence she cites might establish

medical equivalence; indeed, she does not even identify a particular Listing she believes V.A.G.

might meet or equal.[11]    See Knox v. Astrue, 327 Fed. Appx. 652, 655 (7th Cir. 2009) (declining

to remand where the claimant presented no medical evidence supporting the position that his

impairments met or equaled a particular Listing); see also Trower v. Colvin, No. 14-C-0917,

2015 BL 112186, at *27 (E.D. Wis. Apr. 20, 2015) (finding error regarding the Listings harmless

where the claimant did not even attempt to show that she met or equaled any particular Listing,

and collecting cases).    Nor did plaintiff, represented by counsel at the hearing, ask the ALJ to

obtain additional evidence.    See Buckhanon v. Astrue, 368 Fed. Appx. 674, 679 (7th Cir. 2010)

(noting that although the ALJ bears some responsibility for developing the record, he is also

free to assume that a claimant represented by counsel has presented her strongest case for

benefits); see also Poyck, 414 Fed. Appx. at 861 ("Particularly in counseled cases, the burden

is on the claimant to introduce some objective evidence that further development of the record

is required.").    Given these circumstances, I can see no abuse of discretion  in the ALJ's failure

to sua sponte summon an ME.  See Thomas v. Astrue, 352 Fed. Appx. 115, 166 (7th Cir. 2009)

(finding no abuse of discretion in failing to obtain further medical opinion without a request); see

_____

[11]As indicated above, in her pre-hearing memorandum to the ALJ, plaintiff argued in
conclusory fashion that V.A.G. met Listing 2.07; she developed no argument based on the
specific criteria of that Listing.  In any event, Listing 2.07 applies to adults, not children.  In her
brief in this court, the Commissioner explains why the cited evidence fails to show medical
equivalence under the potentially applicable hearing loss Listings for children.  (R. 14 at 5-6.)
Plaintiff filed no reply brief rebutting this argument.

22

Luna v. Shalala, 22 F.3d 687, 692 (7th Cir. 1994) (explaining that the court generally defers to the ALJ's judgment on how much evidence to gather, and a significant omission is usually required before the court will find the ALJ failed to fully and fairly develop the record).

## B.    Substantial Evidence

Plaintiff argues that substantial evidence does not support the ALJ's analysis of the domains of acquiring/using information, attending/completing tasks, interacting/relating with others, moving about/manipulating objects, and health/physical well-being.  However, rather than assessing the weight of the evidence upon which the ALJ did rely, plaintiff primarily faults the ALJ for not discussing the 2014 IEP report.

The ALJ must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence.  Pepper, 712 F.3d at 362.  Here, while the ALJ did not specifically mention the 2014 IEP report,[12] he did discuss the other school records regarding V.A.G.'s need for accommodations based on her hearing loss.  (Tr. at 21, citing Ex. B11F.)  Plaintiff fails to show that the IEP report, which recommends essentially the same accommodations, supports a different conclusion on the domains.  See  McGraw v. Comm'r Soc. Sec., 609 Fed. Appx. 113, 116 (3d Cir. 2015) (finding any error in failing to discuss medical report harmless where the report was cumulative, adding nothing what the ALJ had already taken into account).

_____

[12]As indicated in note 9, supra, it appears that plaintiff submitted this report after the record had closed.  However, it was received before the ALJ issued his decision, and the Commissioner makes no argument that the ALJ was not required to consider it based on the timing.  Cf.  Eads v. Sec'y of the Dep't of Health & Human Servs., 983 F.2d 815, 817 (7th Cir. 1993) (indicating that the correctness of an ALJ's decision depends on the evidence that was before him; he cannot be faulted for having failed to weigh evidence never presented to him).

### 1. Acquiring/Using Information

Plaintiff notes that an ALJ should in evaluating this domain consider whether a child-claimant has received special education services, such as assignment of a personal aide, remedial or compensatory teaching methods, or placement in a self-contained classroom; related services to help the child benefit from special education, such as occupational, physical, or speech/language therapy; or other accommodations to account for the child's impairment, such as front-row seating in the classroom, more time to take tests, having tests read to the student, or after-school tutoring. SSR 09-03p, 2009 SSR LEXIS 3, at *9-10. Plaintiff argues that the ALJ failed to address any of these factors, but that is incorrect. The ALJ discussed the accommodations V.A.G. received at school, as set forth in the September 2014 Section 504 report. (Tr. at 21, citing Ex. B11F; Tr. at 350-57.) While the December 2014 IEP evaluation report, which the ALJ did not specifically discuss, concluded for the first time that V.A.G. was eligible for "special education" services (Tr. at 263), the nature of those services was essentially the same as the accommodations set forth in the Section 504 report the ALJ did consider. (Compare Tr. at 275-77, with Tr. at 354.) Plaintiff points to nothing materially different.

Plaintiff notes that SSR 09-03p also directs the ALJ to consider whether mental impairments, such as anxiety, impact a child's ability to function as school. Id. at *8. Plaintiff claims that the ALJ failed to take account of V.A.G.'s treatment for adjustment disorder and her long-term relationship with her therapist. Again, that is incorrect. The ALJ found V.A.G.'s adjustment disorder to be a severe impairment (Tr. at 18), and he discussed her therapy for that condition, concluding that it did not affect her school performance or prevent her from making friends (Tr. at 20, citing Ex. B14F, records from therapist Jarvis).

In finding a less than marked limitation in this domain, the ALJ primarily relied on

24

V.A.G.'s good performance in school, despite her hearing impairment.[13]  She earned good grades, performed well on standardized tests, and her teacher reported age-appropriate functioning.  (Tr. at 21.)  As SSR 09-03p explains, "Poor grades or inconsistent academic performance are among the more obvious indicators of a limitation in this domain[.]"  Id. at *9.  Plaintiff counters that this domain cannot be evaluated based solely on grades.  Id. at *11.  For instance, "good performance in a special education setting does not mean that [a child-claimant is] functioning at the same level as other children [her] age who do not have impairments."  20 C.F.R. § 416.924a(b)(7)(iv).  However, plaintiff points to nothing in the 2014 IEP report indicating that V.A.G. excelled in school only because she took special or remedial classes.  Indeed, the report indicates that V.A.G.'s hearing loss does not "affect her educational performance, including academic performance," and that overall her "skills are well above average when compared to her typically hearing peers."  (Tr. at 264.)

> Finally, plaintiff quotes SSR 09-2p, which provides that:

> information about supports children receive can be critical to determining the extent to which their impairments compromise their ability to independently initiate, sustain, and complete activities.  In general, if a child needs a person, a structured or supportive setting, medication, treatment, or a device to improve or enable functioning, the child will not be as independent as same-aged peers who do not have impairments.  We will generally find that such a child has a limitation, even if the child is functioning well with the help or support.  The more help or support of any kind that a child receives beyond what would be expected for children the same age without impairments, the less independently the child functions, and the more severe we will find the limitation to be.

2009 SSR LEXIS 2, at *17.  Plaintiff contends that, because the ALJ failed to address the 2014

---

[13]The ALJ also relied on the questionnaire from plaintiff's teacher, noting no limitations in this domain (Tr. at 21, citing Ex. B8E; Tr. at 217), and partially credited the opinions of the state agency consultants, both of whom found no limitations in this domain (Tr. at 20, citing Ex. B2A, B4A; Tr. at 112, 123.)  Plaintiff points to no opinion evidence finding greater limitations.

25

IEP, he overlooked the accommodations that allowed V.A.G. to function. As discussed, however, the ALJ did consider the accommodations MPS provided, even if he did not cite this specific report. (Tr. at 21.) Further, the ALJ's decision comports with SSR 09-2p, in that he found V.A.G. had some limitations in this domain, but that those limitations were, given her strong academic performance, less than marked. Substantial evidence supports that finding.

### 2. Attending/Completing Tasks

Plaintiff notes that, under SSR 09-1p, the ALJ must consider how well the child can independently initiate, sustain, and complete activities, 2009 SSR LEXIS 1, at *7, and she contends that in this case the ALJ failed to consider all the help V.A.G. needed to perform well at school. She argues that the school records demonstrate V.A.G. could function only with the assistance of special education services. As indicated above, the ALJ acknowledged V.A.G.'s accommodations in discussing the first domain, and on review the court reads an ALJ's decision as a whole. See Rice v. Barnhart, 384 F.3d 363, 369, 370 n.5 (7th Cir. 2004). As also discussed above, the December 2014 IEP report recommended largely the same accommodations as the September 2014 Section 504 report the ALJ cited.[14]

Plaintiff argues that the December 2014 IEP documents problems in completing tasks, but it is hard to see how this evidence could support a marked limitation. Plaintiff notes a reference in the IEP report to V.A.G. not handing in all of her work in social studies and reading, her grades went down in those subjects, and her grades in geography were "proficient"

---

[14]The primary additional concern addressed in the IEP report appears to be the need for V.A.G. to become more knowledgeable about her hearing loss, know how to manage her needs in various environments, and confidently advocate for herself. (Tr. at 270.) To address these concerns, she would receive specialized instruction in self-advocacy/auditory skills for 30 minutes once per week. (Tr. at 276.) Plaintiff fails to explain how this level of special education supports a marked or extreme limitation in any domain.

26

except in her effort. (Tr. at 261.) However, earlier in the same paragraph, the report indicated: "Overall, [V.A.G.] is very intelligent and doing a great job in school. She is a hard worker and gets her work done. She is self-motivated and shows respect for others." (Tr. at 261.) Other portions of the report further undercut any claim of marked limitations in this domain. For instance, during testing, V.A.G. put forth excellent effort, and her "attention and concentration appeared to be excellent." (Tr. at 262.) The report further noted that V.A.G. "functions exceptionally well in the school and social environments." (Tr. at 270.) She scored in the high-average range compared to same-age peers. (Tr. at 270.) Accordingly, any error in not discussing this specific piece of evidence was harmless.

The ALJ noted that V.A.G. got good grades, maintained good attendance, completed homework as assigned, and did regular chores at home. Although plaintiff at times complained about V.A.G.'s work habits, the ALJ cited evidence from the therapy records that plaintiff had her own obsessive traits and tended to exaggerate her complaints about how well V.A.G. did her chores. (Tr. at 22.) Plaintiff makes no argument that these observations lacked substantial support in the record.

### 3. Interacting/Relating with Others

Plaintiff argues that the ALJ minimized the emotional issues V.A.G. experienced due to her hearing impairment and the limitations that impairment caused in her ability to interact and relate to others. But mere disagreement with the manner in which the ALJ weighed the evidence will not support remand. See, e.g., Shideler v. Astrue, 688 F.3d 306, 310 (7th Cir. 2012) ("We do not reweigh the evidence or substitute our own judgment for that of the ALJ; if reasonable minds can differ over whether the applicant is disabled, we must uphold the decision under review."). The ALJ acknowledged that V.A.G. often felt ashamed because of

27

her hearing impairment, but this did not cause her to isolate herself from others.  (Tr. at 23-24.)
She regularly attended school, had friends, got along well with others, and participated in
cheerleading and other after-school activities.  (Tr. at 24.)  Substantial evidence supports these
observations.

Plaintiff faults the ALJ for relying on V.A.G.'s "unsubstantiated" ability to read lips when
interacting with others outside the classroom, but V.A.G. herself testified that she was pretty
good at reading lips.  (Tr. at 96.)  Plaintiff further objects to the ALJ's finding on this domain on
the ground that V.A.G. requires special education services.  However, plaintiff fails to develop
any argument on this point.  See Crespo v. Colvin, 824 F.3d 667, 674 (7th Cir. 2016) (noting
that perfunctory and undeveloped arguments are waived).  Plaintiff contends that the ALJ
should have found marked or extreme limitations in this domain, but she develops no argument
as to why.

### 4.    Moving/Manipulating Objects

Plaintiff argues that while the ALJ acknowledged the reports of balance issues and
safety concerns, he passed those concerns off as over-protectiveness.   The ALJ cited
substantial evidence – in the form of notes from V.A.G.'s therapist – in support of that
conclusion.  Plaintiff also faults the ALJ for failing to consider the directions given by Dr. Martin
that V.A.G. be accompanied by teachers and peers and that she be provided with
transportation to and from school due to safety concerns.  However, the letter from Dr. Martin's
office indicating that V.A.G. needed to be accompanied by a peer or teacher when walking to
and around school is dated January 27, 2015, after the ALJ's decision, and was first submitted
to the Appeals Council.  (Tr. at 6, 397.)  The ALJ cannot be faulted for failing to consider

evidence that was not presented to him.[15]  See Eads, 983 F.2d at 817.  The evidence the ALJ did cite – the therapist's opinion that plaintiff was over-protective, the report from V.A.G.'s teacher noting no problems in this domain, and V.A.G.'s ability to walk without assistive devices, ride a bike, and roller skate – provided a substantial basis for his finding in this domain.

### 5.    Health/Physical Well-being

Plaintiff argues that the ALJ erred in finding that V.A.G.'s left ear hearing loss remained mild when in fact the evidence shows that her left ear had worsened to a moderate degree, which in combination with her right ear hearing loss constituted a severe change in her total hearing ability.  Plaintiff offers no record citation in support of this claim.  (R. 12 at 17.)  As the ALJ noted, while V.A.G.'s left ear hearing had fluctuated, the most recent testing revealed mild hearing loss on the left.  (Tr. at 19-20, 369, 371.)

Plaintiff further argues that while the ALJ acknowledged V.A.G.'s adjustment difficulties relating to her hearing problems, he failed to account for the cumulative effects of her hearing loss and her adjustment disorder.  However, the ALJ did consider both of V.A.G.'s impairments under this domain, noting that they did not diminish her ability to maintain appropriate school and social functioning consistent with her age.  The ALJ also noted that, apart from her hearing

---

[15]On August 7, 2013, an APNP from Dr. Martin's office provided a note indicating: "Please provide bus transportation to school.  Pt. has severe to profound hearing loss in [right] ear & moderate hearing loss in [left] ear.  Unsafe to have her walking to school through intersections with this degree of hearing loss." (Tr. at 338.)  MPS granted this accommodation, as indicated in the Section 504 report the ALJ cited.  (Tr. at 354.)  Plaintiff develops no argument that V.A.G.'s need for bus transportation would support a marked or extreme limitation in this domain.

issues, V.A.G. had generally been healthy.[16] Finally, the ALJ relied on the opinions of the state

agency consultants finding a less than marked impairment in this domain. This evidence well

supports the ALJ's conclusion. Plaintiff again develops no argument that the ALJ should have

found marked or extreme limitations in this domain.

---

[16]The record, which contains a limited amount of medical evidence, virtually all of which pertains to V.A.G.'s hearing issues, supports this conclusion. On May 26, 2011, Dr. Martin removed V.A.G.'s left ear tube and inserted a new tube. (Tr. at 317-28.) On October 31, 2011, Diane Contreras, Au.D., performed an audiological evaluation, which suggested normal hearing sensitivity in the left ear with a 100% word recognition score; right ear testing revealed profound hearing loss with 0% word recognition. (Tr. at 319.) On May 14, 2012, V.A.G. returned to Dr. Contreras, complaining of decreased hearing in her left ear, as well as increased problems with balance. Testing continued to suggest a profound hearing loss in the right ear and a new hearing loss in the left ear, which was mild; word recognition testing in the left ear remained excellent. (Tr. at 321.) On May 14, 2012, Dr. Martin wrote a letter indicating that V.A.G. benefitted from the FM system and encouraging its continued use. (Tr. at 325.) On August 16, 2012, Dr. Martin removed V.A.G.'s left-sided pressure-equalizing tube following issues of recurrent drainage on the left side. (Tr. at 326-27.) On May 14, 2013, V.A.G. saw Dr. Martin for follow up of eusthachian tube dysfunction/tube check. She continued to do very well from a hearing standpoint and excelled in school. Her right sided auditory dysfunction did not appear to limit her, her ETD seemed to be resolving, and her ears were clear on exam. (Tr. at 359-60.) On July 16, 2013, V.A.G. returned to Dr. Martin, doing well until the last few weeks when she complained of ringing in her ears. (Tr. at 360.) At her last exam, her ears were clear, and she was as healthy as Dr. Martin had seen in her in some time. On testing, the left side showed moderate sensorineural loss that was new and not present on the last test. (Tr. at 361.) Dr. Martin did not have an explanation for the loss on the left, suggesting an MRI and repeat testing with her regular audiologist. (Tr. at 362.) On September 12, 2013, Dr. Contreras performed an evaluation, which revealed a mild sensorineural hearing loss in the left ear, for which a hearing aid was recommended. (Tr. at 339, 362.) On October 10, 2013, V.A.G. returned to Dr. Martin, doing quite well with the hearing aid. The MRI showed no visible left side abnormality. (Tr. at 363.) On November 15, 2013, V.A.G. returned to Dr. Contreras to pick up her repaired hearing aid, which had broken. (Tr. at 365.) On May 13, 2014, V.A.G. saw Dr. Contreras for a hearing aid check, reporting no changes in her hearing. (Tr. at 366.) Testing showed mild sensorineural hearing loss on the left, with the results significantly improved compared to September 2013. (Tr. at 367.) On July 16, 2014, Dr. Contreras noted that V.A.G.'s hearing in the left ear varied from borderline normal to mild. On testing, Dr. Contreras noted mild hearing loss on the left, with the results poorer than in May 2014, suggesting a continued fluctuating hearing loss. However, word recognition scores in the left ear remained excellent. (Tr. at 369.) On October 7, 2014, Dr. Contreras's testing revealed stable, mild hearing loss on the left. (Tr. at 371.)

30

## V. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is affirmed, and this case is dismissed. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 29th day of November, 2016.

/s Lynn Adelman
LYNN ADELMAN
District Judge